Good afternoon, your honors. Good afternoon, Mr. Owens. May it please the court, I am Shannon Raganese here on behalf of the appellants, Officer Lucht and Officer Widom. And I'd like to begin by talking about the standard for evaluating qualified immunity on summary judgment. In this case, in order for a court to deny qualified immunity to the officers in the case, there must be a body of law that clearly establishes the officer's actions toward the subject, in this case Mr. Leng, would violate his constitutional rights under the undisputed facts of the case. That makes it a purely legal question. Here, what happened to the lower court is the trial court performed more of a cursory review of qualified immunity and applied the wrong body of law in reaching its conclusions. If you look closely at the court's opinion, the court cited the case of Van Bui v. San Francisco, which is an unpublished Ninth Circuit opinion, and the court cited Harris v. Roderick. And the court concluded that those cases clearly established that officers may not kill suspects who aren't an immediate threat of safety, even if they're armed. Your Honors, both of those cases were police shooting cases, where officers made the decision to use deadly force by firing their weapons. Those cases are very different from the case before you today, which is the Leng v. Issaquah case. In the Leng case, officers applied a low-level tactical force of physical escort, physical handcuffing. Yet the court failed to make any comparison or draw any attention to cases that would clearly establish, under these circumstances, that the officer's actions would violate Mr. Leng's rights. Counsel? Go ahead. There's a lot of questions for you, so I'll start with Judge Miller and then we'll go to Judge Christin. I think plaintiff's argument is that there is a factual dispute as to—I think you characterized it as a low-level use of force. There's a factual dispute as to just what level of force was used. So can you address that? Yes, Your Honor, thank you. And I would point out to the court that the estate's arguments are really based on 20-20 hindsight and the consequences of the tactics that were applied. Yet, if we follow the standard under Graham v. Connor, we are not allowed to use 20-20 hindsight. It's not 20-20 hindsight, I think. I mean, isn't it—I mean, it's almost a sort of reciprocal argument that low-level force ordinarily doesn't result in death. The fact that whatever they did did result in death creates an inference that it must have been something more violent. What's wrong with that line of reasoning? So, Your Honor, what we need to look at is what officers are trained is reasonable and necessary under the circumstances. And that's what Graham requires them to do. That's the evaluation they go through. They are not trained, and no case has been cited by either party or by the trial court that would clearly establish that handcuffing individuals, physically escorting them, you know, putting them on their knees to handcuff them, is likely to result in serious injury or death. There is no body of law that would put the officers on notice that their actions would be unreasonable because that might happen. This is a situation where Mr. Lange had a latent, unknown, undisclosed condition. Even his own family did not know about it. So, to look at it from the perspective of what that consequence was from this unknown latent condition does not follow the requirements of Graham v. Conner, which require us to look at this from the perspective of what the officers knew at the time they took their actions. There's no evaluation, and again, I think it's telling that the trial court had to cite two shooting cases to try and find a body of law that would clearly establish their actions would be unconstitutional because this doesn't happen ordinarily in a handcuffing case because it's an unusual situation. Counsel? Counsel? Yes, Your Honor. Could you back up, please, because I think we can all agree this is a very tragic miscommunication, and these officers, being from their perspective, they're responding to a domestic violence call, and that can be a very dangerous situation, and it's awful. And that is not at all what the decedent's wife thought. She didn't even call for help. So, I go to this scenario back up a bit. If you open the door, there's these police officers. I'm sure that was very shocking to her. But I'm trying to figure out why the officers, going to Judge Miller's point, why did the officers have a reason to even step across the threshold? There is a dispute of fact about whether the decedent was standing right behind his wife or whether he came out later from the bedroom. I think if we look at that fact, a disputed fact, in the light most favorable to the officers, he's probably standing within a few feet behind his wife at that point, and he's making some statements that nobody can understand, including his wife. But be that as it may, when they arrived, I think it is undisputed the house was quiet. I appreciate they thought they were responding to a domestic violence call. But what is it when the door opens that allows them to come in uninvited? So, thank you, Your Honor, for that question. I'd like to address a few things. First and foremost, it is undisputed that Ms. Yang invited the officers inside. And the estate's perspective is that the door never closed. It remained open. Could I stop you there? Could I stop you there? I think that I've read two things in the record about that point, about her invitation, and I think in one place it suggests that they had already stepped in when she said come in. Am I misunderstanding that? I think you are misunderstanding that fact, Your Honor. Okay. I'll take a second check, but go right ahead. That helps me. Thank you. Thank you. Thank you. I would also point out to the court, when you look at the trial court's order, the court didn't rule on a claim of forced entry. That was actually not brought in the complaint. That arose for the first time in the estate's appellate brief. And so that was not an issue, and the court didn't even analyze the consent issue. So if we take the facts in the light most favorable to the estate, it means that she invited them in and the door never closed. So to go to Your Honor's point on, yes, this is a domestic violence call, but when they arrived there it was quiet, and that is undisputed. The officer said they didn't hear any yelling. But here are some very important undisputed facts on that issue. The call came in from the 911 caller just four minutes prior. He reported a verbal, domestic, sound of things being thrown, possible four subjects involved. So when the door opens, correct, the officers did not see any apparent bleeding, no gunshot wounds, no bruising or obvious injury. Officers did not see any broken objects in the threshold. But what they didn't see were the other two possible involved parties. And what they couldn't do was ask Mr. and Ms. Lange, what's happening here, are you okay, do you need help? Is the gesture in an invitation because she doesn't want to talk about private things in public? Is it a request for help? And this is the fact, the key fact that distinguishes this case from all of the others. Hold it right there. Do you know if they, does the record show whether they tried to ask her, engage in, at what point did they understand that she's speaking a different language? From my reading of the brief, it sounds like that, I'm not sure that really happened before they stepped in. It seems like one fell swoop to come in and perform the maneuver that Judge Miller described. No, Your Honor, they were able to identify immediately that there was a language barrier. And this was before they stepped in. Could I get the record site for that? Could I get the record site for that, please? Yes, sir. Let's see, it is 6ER1247. Thank you. I have a more fundamental question, and that is, I think it's clear from the testimony that the officers didn't believe that there was any threat to themselves when they were there, correct? Yes, Your Honor. Not at that stage. At that stage. And also, they're there on what they called a DV verbal, correct, a verbal encounter that was categorized as domestic violence. And at this point, they don't have any information to show that this person we now know as the wife was under any threat, correct, at this point? I would disagree with the court on that issue. The information they have is from the 911 caller that four minutes prior, there was yelling, there was an argument, there were up to four people, and the sound of things being thrown. So we're talking really close practice. You criticized the district court, but we're looking at this de novo. So we can really kind of put aside cases cited, whether not published or otherwise. But I do look at this Meredith v. Erath case in the Ninth Circuit, and it seems to me that it's the closest one we have. So the situation we're in is no threat to the officers. The district court has made a finding that it doesn't really arise out of a domestic violence incident. And we have basically competing facts. So in that situation, why wouldn't it be appropriate to deny qualified immunity and in light of these disputed facts, go to trial? Your Honor, because there are undisputed facts sufficient for the court to grant qualified immunity. The court should, in its review, not consider the disputed facts. But there are many undisputed that support qualified immunity. And to the court's point on the Meredith v. Let me ask you about that. You can have some what you say are undisputed facts, but you're basically setting aside the disputed facts. So is it your position that those are irrelevant? On the issue of whether it was clearly established in the law to give these officers fair warning that their conduct would violate the Constitution, yes, Your Honor. The court should look to the undisputed facts and what the law told the officers. And I would ask the court to look at this from the perspective of what would they have done if they opened the door or the doors opened. They cannot verify with this couple that they're okay. It is being argued that they should have left. That would violate Washington state law, and that would violate the policy and the legislative actions that we have seen the courts and our states try and take to ensure that individuals are protected from domestic violence. And that's why the Erath case is very distinguishable. I don't think anybody thinks, you know, excuse me, but I think it would be misreading of the cases to suggest they should just up and leave. The question is what should they do, you know, where they end up with these handcuffs and back across the couch. I mean, that's down the road. They haven't left, so that's really good judgment on the part of the officers. But that's not really the dispute. The dispute is the force which was determined to be significant or substantial. Now, I recognize they would disagree with that, but that is quite a significant dispute of fact vis-a-vis qualified immunity. So how is it you can take that fact out, as you just said, and ignore that? Your Honor, because we have two people unaccounted for who could be in the apartment needing assistance, and because the couple were standing in close proximity to each other, just about every other case that was cited by both parties in the briefing involves a situation where by the time the officers got there, the couple is separated. One's inside the house, one's outside of the house. Here we have them standing right next to each other. And due to the combustible nature of domestic violence, which is readily recognized by the Ninth Circuit, if the officers don't separate these individuals for safety and have an opportunity to make sure nobody else is injured in need of either protection from an assault or treatment from an assault, they are not doing their duty as required. And so that is the distinguishing factor. It's a commonality in the cases that were cited that we didn't have those factors. They could either communicate with the individuals who said, hey, nothing to see here, we're okay, and that was missing here, or they were already separated when the officers arrived, such as in the Bonnevert case. And so that takes that immanency, that immediacy away. But if they're going to do their community caretaking, they have to be able to separate the individuals and figure out what's happening. How many officers do we have there? Two, Your Honor. And how many people are right in front of them? Two in front of them, two unaccounted for. And so, you know, we have these cases like Miles where the court says they're talking about when an officer reasonably believes force is necessary, but that is because the officer needs to protect his own safety or the safety of others. What was the justification for the handcuffing? To ensure that they could communicate with Ms. Yang so they could look inside the apartment and make sure no one else is injured without worrying about someone getting injured by Mr. Lang. Usually you don't do that by handcuffing, however. I mean, that's the difference in this case. It's not like we'd like you to come with us or point to the woman, come with us. That's what usually happens. They take them outside. They separate the two people. So usually handcuffing isn't really the remedy that you're talking about. Do you have a case where the court has suggested that that would be appropriate conduct? Respectfully, Your Honor, we did cite those cases in the briefing. I will take a look for them so I can give you a cite if I may in brief rebuttal. But in the meantime, I would point out to the court, the key difference here is they couldn't just say, Ma'am, can you come with us? Ma'am, are you okay? And I would also ask the court to recall that the law looks at this from this rapidly evolving time-constrained situation. And so these officers are trying to be reasonable and use their best judgments. And we have to go back to what did the case law clearly establish for them? No one was able to find any cases that analyzed how do you handle a domestic violence call when you can't communicate immediately with the parties, when they're in close proximity and you don't know what the lay of the land is. These officers acted the reason. We've let you go over it by a couple of minutes, so I assume you want some time for rebuttal? Yes, Your Honor. I appreciate it. All right. Your Honor. Thank you, Your Honor. May it please the court, David B. Owens on behalf of the estate of Wang Shen Leng and Li Ping Yang. This court lacks jurisdiction over this appeal, and it should be dismissed. As the argument just confirmed and was already set forth in the briefing, there are pervasive factual disputes here, and the defendants in this case refuse to accept or construe the record in the light most favorable to the plaintiff in this case. This court's interlocutory jurisdiction is limited, and it is limited to orders that are separate from and collateral to the merits of this action. But from top to bottom, even though they don't use the language sufficiency of the evidence, that's exactly what is going on in this appeal. So this court should, in fact, dismiss this appeal for want of jurisdiction. And the limited narrow interlocutory review, the exception to the rule that prohibits immediate appeal before a final order, only works where the appellant concedes the facts, but they refuse to do so here. And this pertains to each phase of this encounter. So if you go before, during, and after it was complete. So beforehand, of course, this court's decisions recognize that domestic violence is an important issue, and it can be. However, the defendants construing the record against plaintiff have exaggerated the circumstances on the ground here. And there's evidence that a DV verbal call is simply a disturbance. It doesn't even necessarily mean something criminal happened. And this was also a code one call for the Issaquah Police Department officers, which means life and limb are not believed to be threatened. And so while there are many circumstances that can be considered domestic violence, officers have to respond on the ground to what they're hearing. So before you even get there, the defendants have construed the record against plaintiff. And then, of course, once you arrive. Could you go to the front door? Right. It's quiet. We take domestic violence very seriously, counsel, so I'm not sure this is your strongest point. But at any rate, I think you're right. We're looking at the facts in the light most favorable. So the officers show up, and it's quiet. I think the opposing counsel did not dispute that. Right? Right. And the resident opened the door, and she's not expecting to see officers at all, right? Because this was a neighbor who's called this in, and there's, I think, by all accounts, an honest mistake. They think they're responding to a domestic violence call. She opens the door, and there they are. So at that point, I've just been reading these, re-reading, these pages of the transcript about at what point the officers realized there was a communication problem, and they come in. At some point, she invites them in, and the officers don't remember what they said at the door, according to this transcript. Right, Your Honor. So there are disputes about what took place at the door itself. And I think it's clear that there was a language barrier on both ends. The real dispute. Sorry, forgive me, but no dispute that she invited them in. Is that right? I think that's clear. No, there is no dispute that she waved them in. The question is whether or not the defense, what the officers themselves have said, that they thought that Mr. Ling wanted them to leave. And so whether or not there's consent, there couldn't have been consent. And just as a factual matter, if you look at the excerpt of record from 53 to 59, whether the entry was lawful was briefed below. So I don't know if counsel was mistaken in saying that it was raised for the first time on a appeal. Can we go to this point? Because I'm going to try to quit interrupting you. But I think I've read on the record she's gesturing them to come in, and the officers clearly testify that her husband, at some point he was either in the bedroom, came back, but anyway he winds up behind her, and he's waving them back out. Is that right? That's what they testified. But it seems like they're responding inconsistently to the officers. Is that right? That's correct, Your Honor. And so the issue is whether or not under the warrantless entries into homes are presumptively unreasonable, and whether or not there was a belief that somebody was in actual or imminent injury had occurred at the time. And so the officers admit that they didn't see any evidence of actual or imminent injury. They didn't see anything that corroborated the 911 call. In addition to it being quiet, the officers didn't speak to the complainant, the person who had made the call, to find out whether it was even this couple that this was particular to. But as Judge McEwen points out, nobody expects that they were going to just leave. They thought it was going to be four people. Where are the other two people? So they're going to step in, and it seems entirely reasonable, I think we acknowledge as much, that they're going to try to separate those two people. So the question is why did they need to come in and use force, right? I think that's right, Your Honor. And just to put a finer point on it, which is that no one says that they should have left. The question is not whether they could continue their investigation, it's what does the Constitution require about how they conducted that investigation. So when it comes to the intrusion, once they're in the door, there is no justification for handcuffing somebody, moving them across the room, taking them down to the ground in a manner that causes significant injuries. Can I push back on that just a little bit? It seems to me there is justification for the officers to try to contain the status quo for a safety reason, and he's waving his arms around, and I think she agrees with that, and he's making gibberish sounds that even she couldn't understand what he was saying, the officers certainly couldn't. So maybe the officers' use of force was wrong. My question is why was it unreasonable for them to try to handcuff him and to just slow the action down so they could figure out what's going on? Why were they unreasonable? Yeah, this court's decisions have repeatedly held in a variety of contexts that handcuffing significantly increases the intrusion of a given, and so that's Washington against Lambert, and what those cases focus on is whether or not, one, there was a very serious crime like something involving a gun, or an issue of officer safety. Here the officers admit there was no issue of officer safety, and in fact they towered over him, and there were multiple of them. So it's not only the handcuffing, and recall in this instance, the handcuffing follows the takedown. So they seized him. They could have just held him there, but they chose not to. They could have not moved him across the room from a standing position to a seated position, but they chose to put him down onto the ground, bent over a couch. This caused, and in addition to the spinal cord injury that killed Mr. Lane, also bruises and scrapes on his body. He was bleeding. His wife has testified that she was terrified and crying while this happened. So the factual dispute, which we believe precludes jurisdiction, at the core of this is that the defendants say, we gently escorted them across the room, and Ms. Yang, as well as the medical evidence, confirmed that they did use more force in so doing, and so what this court's cases have said, and I think Meredith against Erath is directly on point, as is Santos against Gates, which we cited, Washington against Lambert, that you don't perform a brief investigatory detention of somebody by using handcuffs and takedowns in those manners. So by all means, Your Honor, the court is right that no one is making the contention here that the officers couldn't conduct an investigation. It is the manner in which they did it that made it unreasonable and unreasonable under clearly established law, particularly when you construe the facts in the light most favorable to the plaintiff in this instance. In addition, as a final- Could you just go back one minute, because you're speaking so fast, I think I might have missed it. My apologies. And that was when you said that you had raised the unlawful entry below, and what was your citation to the record on that? Yeah, our brief on this response to summary judgment is the excerpts of record from 53 to 59. That's the six pages where this was discussed in brief below. Thank you. So your answer to the question about why are there- they could be wrong, they could be mistaken, but not unreasonable, and the answer to your question is they were unreasonable because it really bound up into this issue of fact about how much force they used to quote-unquote separate. Is that fair? That's part of it, Your Honor. One, there's a dispute about what they observed, but they do admit that they did not see Mr. Lange commit a crime, that they didn't have any evidence that he had committed a crime, but they wanted to further their investigation. So intrusions like a Terry Stop for that type of a limited investigatory detention, you have to have to go the additional step of handcuffing somebody. What this court's decisions have required is that there be some specific reason about officer safety. The officer's admissions in this case prove that they went too far under clearly established law. And even if this court wanted to examine this separately through the lens of Graham against Connor, the force remains unconstitutionally excessive because the quantum of force that was used, there's a dispute about that. We say it was substantial. The medical evidence supports that. In addition to that, the officers admit, which is supposed to be the biggest factor under Graham, whether or not the person poses a threat to themselves or to others, the officers admit that there was no issue there with respect to that. Mr. Lange did not actively resist or try to flee. And in addition, the severity of the crime, while domestic violence can be quite serious, and no one's disputing that, the dispatch in this particular case- Did they say there was a potential threat to others? I know they did as to themselves, but did they also say as to others? They said that they were trying to investigate whether or not there was a threat to somebody else. And they did not perceive him in particular to be- they didn't have any evidence that he was a specific threat. And I want to take a step back because this particular call was not about Mr. Lange doing- Yosemite said, I saw this husband doing this thing to a wife. And in fact, the 911 call- here, the 911 caller said, I was calling because I heard some loud noises and I was concerned about this elderly couple. The officers did not have an objective, reasonable basis to believe that he had done anything wrong whatsoever. Wait, wait, wait, hold it. There was more to it than that, and I don't want to get bogged down on this because I think there's an incorrect report of maybe an object being thrown. But there's also- and opposing counsel stressed this, and I don't hear you responding to her concern that it was a verbal dispute that was called in and that the concern was there may be four people there. So when the officers said that- I think they clearly said they didn't fear that either these two people, your client or the decedent, posed a threat, a safety risk to the officers. Did they say that about the other unknown two people? They turned out to be phantoms. I'm concerned that perhaps we're giving short shrift to that problem, that the officers still didn't know, where are these two other people? Are we in danger? Is that wrong? I think at this juncture, Your Honor, it's another way to how to interpret the facts because from our perspective, the fact that what the officers encountered on the ground did not corroborate what was in dispatch is a reason that they should have taken a step back and said, well, I was told that there was somebody who was yelling and that things were being thrown. I didn't hear any yelling or seeing anything being thrown. Somebody said that there were four people, but I see only two in front of me. So the facts of the 911 call were not corroborated. They didn't speak to the 911 caller, the complainant, and the law that counsel cites regarding domestic violence. And what distinguished this case from many, many others is that they didn't do that investigation and look at the facts that negated the purpose for the call in the first place. But opposing counsel is going to say, and so I want to give you a chance to respond, you know she's going to say they were doing their investigation. That's the point. They were trying to come in, handcuff him because he's flailing and not making sense and kind of get the status quo maintained, get these people separated, and investigate are there other people in the house, in the premises. So what's wrong with that? I get that you think too much force was used. I'm just trying to make sure I understand what is your answer to, I don't think the officer ever said that they were concerned that their own safety wasn't jeopardized by these two other phantom people. They didn't say anything about these two other phantom people. We don't even know that these people exist. And this is the problem, which is that at summary judgment, given, you know, it's like one of these things where you have an informant who, you know, what is the reliability of this unknown informant? And the information here that they had contradicted what they said. And so what the touchstone of the Fourth Amendment is, is that you have to look at the circumstances in particular. And so this court's decisions repeatedly say that you cannot simply handcuff people and take them to the ground as part of an investigatory detention unless there's some reason for it. Did the person have a knife? Was the crime a murder? Or something involving a gun in particular like that? So should we be ruling on this record because there's a report of four people and they show up and they can only see two people and we really never decide that the other two even existed? My impression from the record is that was just a wrong call. Should we be concluding that there's an issue of fact that prevents us from going forward here about whether or not the other two people, phantom people, reported people, presented a safety risk to the officers? I think that there's issues of fact from top to bottom, Your Honor. And at this stage of the proceedings, the facts have to be construed in the light most favorable to the plaintiffs. And given the fact that the officers have not done that and at sort of each stage of the encounter, from beginning, middle to end, that these factual disputes persist, this court lacks jurisdiction over this appeal. And this is sort of precisely why the interlocutory jurisdiction should be narrow. And there are many qualified immunity appeals that this court gets that raise pure questions of law. The issues that... I'm sorry to interrupt there, but could you go through the evidence that you think creates a dispute of fact on the level of force that was used? Because you referred to the medical expert testimony, but your expert, Dr. Arden, I think in his deposition said this was somewhere between a light touch on the forehead and a car accident, which doesn't seem like it really tells us anything about what the level of force was. So what's the evidence that you would point to on that point? Sure. I think that Dr. Arden's testimony was that the force was substantial and significant. And the response that the court was referring to there was like, could you put this in terms of like newtons or weights or things like that? And he says, no, I couldn't. But as a forensic pathologist, the medical evidence does not only include the severe spinal cord injury. It also includes the bruises, the scrapes, the bleeding. In addition to that, there is the evidence of Ms. Yang herself. She says that the officers violently took him down, that it was happening very rapidly. They took him to the sofa and made him kneel down. And so this court's decisions particularly say that this raises an issue of fact about the amount of force that was used. And in fact, one issue raised with the defendants themselves prevented an expert that says, we cannot scientifically determine mathematically the amount of force that was used. So at core, it goes to weighing the evidence, which is not what we're supposed to do at this time. But I mean, it's obviously not common for the sort of results that we have here, but it's fairly common to have excessive force claims involving handcuffing. So, I mean, is it your view that every time the plaintiff says, you know, the handcuffing was conducted in too violent a manner, that that creates at least a factual dispute and they get to go to trial on that? Well, I think if there's an objectively reasonable basis for doing that, and so in Santos against Gates, the court said, well, looking at the circumstantial evidence, a reasonable jury here could find that this guy had a broken back. The officers say that they lowered him to the ground gently. And that does create a tribal issue of fact for the jury. And usually the handcuff typing cases are sort of in a separate category. This is not about Mr. Lange's wrists. It's about the manner in which he was taken down before the handcuffs were applied and whether or not that was violent and excessive. And as a final matter, and thank you for the time, Your Honors, is it is also curious that Mr. Lange goes completely limp and they left the handcuffs on for more than for around nine or ten minutes after that, while he was limp and unable to sit, to even sit up in his chair. There's no basis justification for that. The medics arrived, they took the handcuffs off. There was no safety issue. They didn't find the rope. I think we have the facts well in mind. So I appreciate that. Thank you, Your Honor. Thank you. Would you please put a minute and a half on the clock for additional time for the city? Thank you, Your Honor. I'm waiting for my extra 30 seconds. It takes minutes to make seconds, so hang on. Is that right? No, it's just not moving. Well, you can go ahead and start, and I'll kind of help monitor. How's that? Thank you, Your Honor. That works for me. The citation that I promised is USV Thompson, 597F2nd, 187. Counsel also referenced Washington v. Lambert, 98F3rd, 1181. There's USV Charlie, 396F3rd, 1074. There are numerous cases where, even on a Terry stop, the courts have recognized if there are factors at issue that warrant a concern about safety or controlling the scene, that handcuffing can be done. It doesn't turn it into an arrest. A brief detention can be done. Here, undisputed facts include Mr. Lange did wave his arms in an erratic manner. Mr. Lange had a look on his face that indicated he was angry that the officers observed. Mr. Lange did utter sounds that were unintelligible. And as the officers moved in, Mr. Lange took a step toward the officers. That's when they determined to take him into custody and to detain him so they could continue their investigation. And again, if they had been able to communicate and ask what's going on here, we would have a different case. That's a distinguishing case. But here, the officers had no option in order to keep the parties separated and safe until they could make that determination. I would like to indicate the court has already keyed on it that threats to others is what we're looking at here. The threat to his spouse, we now know was his spouse, because they were so close together, they needed to get that separation. Before you run out, I guess I'm taking you over time, but could I ask you to address the evidence that Mr. Owens cited on the level of force, specifically the medical evidence and Ms. Yang's testimony? Why doesn't that create a genuine factual dispute? Yes, Your Honor. So what we know from looking at the estate's evidence is that really looking at the quantum of force is purposeless. And that was the example. That's why, whether it's a touch on the forehead or an MVA, anything in between could have caused this injury in someone such as Mr. Lange with those pre-existing conditions. So what we need to do is look at the tactics utilized. Ms. Yang testified it was a three-and-a-half-step distance between the door and the couch. That's how long the escort occurred. Handcuffing was performed. And again, it's important to go back to what are officers trained is reasonably likely to result from certain force tactics. We know if you fire a gun, you're likely to engage in deadly force. They are not trained, and there's no body of case law that tells them if you handcuff someone, physically escort them, kneel them on the ground, and handcuff them over a couch, that you're likely to cause serious injury or death. So when we're doing our Graham v. Connor analysis, we need to look at, again, the interests in getting that safe separation and distance so the officers can do their investigation versus the tactics and the amount of force that was utilized. When you look at the totality here where there wasn't communication, where there were people unaccounted for and the officers needed to do something right away versus stepping out and leaving these two close together on their own, when you look at the totality, it's clearly established in the law that they are entitled to the benefit of the doubt and entitled to qualified immunity for their decision. Thank you. I'd be happy to answer any other questions from the court. I think that we're out of time and out of questions at this point, so thank you. The State of Lange v. Issaquah is submitted. I do thank both counsel for your argument. A very interesting case. And with that, the court is adjourned for this afternoon. Thank you. Thank you.
judges: McKeown, Christen, Miller